| | | |
|---|---|---|
| LENNY GASTON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-cv-01798 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ALLISON BEATTY, PATTI | ) | |
| MCDOUGALL, DR. JOHN MAY, and | ) | |
| ARMOR CORRECTIONAL HEALTH | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Lenny Gaston brings this civil-rights lawsuit, 42 U.S.C. § 1983, for inadequate medical treatment of his kidney condition during his detention at Lake County Jail.[1] R. 33, Am. Compl.[2] The Defendants are Armor Correctional Health Services, Inc., a private corporation that provides medical services at the Jail, as well as three Armor employees—Nurse Practitioner Patti McDougall, Doctor John May, and Administrator Allison Beatty. All of them have moved for summary judgment. R. 59. For the reasons explained below, the motion is granted in its entirety.

## I. Background

The facts narrated here are undisputed unless otherwise noted, and when disputed, the evidence is viewed in Gaston's favor and gives him all reasonable inferences. When Gaston first arrived at Lake County Jail in January 2015, he felt

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.
[2]Citations to the record are noted as "R." followed by the docket number.

fine. R. 61, DSOF ¶¶ 1, 11.[3] But a few months later, he began to experience back pain and stinging urination. R. 74, PSOF ¶ 60; R. 61-1, DSOF, Exh. A, Gaston Dep. Tr. at 29:2-24, 30:9-10.

Over the course of the next year and a half, in a variety of visits, Gaston met with healthcare providers at the Jail. For instance, he had regular checkups roughly every three months with Dr. Eric Mizuno (and later with Physician's Assistant Miteshkumar Modi) at the Jail's Chronic Care Clinic. DSOF ¶¶ 6, 42, 52; R. 62, DSOF, Exh. B, Gaston Patient History at 8-26 (sealed).[4] In addition, Gaston was also allowed to request medical sick-call visits for more specific health issues that cropped up. DSOF ¶ 12.

The exact process for requesting sick-call visits is not entirely clear from the record, but it appears to have involved at least the following steps. First, a patient would obtain a blank medical-complaint form from a box, describe his symptoms on the form, and then put the completed form into a different locked box. Gaston Dep. Tr. at 31:21-24, 32:1-7. At some point, the nursing staff would review completed sick-call request forms. DSOF ¶ 14. Afterwards, the patient would be called down to the nurses' "pod" area (that is, their work area) for an in-person evaluation by a nurse. *Id.* ¶ 44. Some issues would be resolved by the nurses, but more complicated issues

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 61], "Pl.'s Resp. DSOF" for Gaston's response to the Defendants' Statement of Facts [R. 74], "PSOF" for Gaston's Statement of Additional Facts [R.74], and "Defs.' Resp. PSOF" for the Defendants' response to Gaston's Statement of Additional Facts [R. 76].

[4]Although the Opinion cites to sealed filings, the information revealed in the Opinion does not meet the strict standards for sealing in the Seventh Circuit.

would be elevated to Nurse Practitioner McDougall. *Id.* McDougall, in turn, could elevate concerns to a physician or physician's assistant, who would then decide if the patient should be referred to a specialist. *Id.* ¶¶ 43-44.

The first time that Gaston met with McDougall was during a sick call visit on November 1, 2016. DSOF ¶ 14; Gaston Patient History at 220. (It is unclear from the record whether Gaston first met with a nurse and was later elevated to McDougall, or if Gaston met with McDougall directly.) During this visit, Gaston told McDougall that he was suffering from kidney pain and burning urination and that there was blood in his urine. DSOF ¶ 15. In response, McDougall asked Gaston where the pain was located. *Id.* ¶ 16. Gaston pointed to his lower lumbar area—but that is not where the kidneys are located. *Id.* McDougall performed a percussive test on Gaston's kidney area, which came back negative for pain or discomfort, and also conducted a urine dipstick test, which returned no sign of blood or infection. *Id.*; Gaston Patient History at 129. McDougall ultimately diagnosed Gaston with lower back pain instead of kidney pain. DSOF ¶ 17. McDougall then provided Gaston some ibuprofen for his back pain and directed nursing staff to monitor his symptoms. *Id.*

Unfortunately, Gaston's symptoms did not go away after his visit with McDougall. PSOF ¶ 62. On January 25, 2017, Gaston had another sick call visit, this time with Physician's Assistant Miteshkumar Modi. Gaston Patient History at 221. Modi assessed Gaston with renal insufficiency. DSOF ¶ 18; Gaston Patient History at 22, 221. As a result, Modi planned to seek a nephrologist referral and a renal ultrasound for Gaston. DSOF ¶ 18.

The next month, on February 20, 2017, Modi had a conversation with Dr. John May, the Chief Medical Officer of Armor, about an unnamed patient with elevated creatinine levels. DSOF ¶ 19. During this conversation, Dr. May responded that the patient should be scheduled to see a nephrologist. *Id*. On that same day, Modi submitted a request for an electronic nephrology consultation for Gaston using an online platform called Arista.[5] *Id*. ¶¶ 19-20. Arista allowed medical providers at the Jail to request electronic consultations from specialists, who were available 24 hours a day through the platform.[6] *Id*. ¶¶ 35-36. The medical provider would submit a treatment question on behalf of a patient, and then a relevant specialist would respond with recommended diagnostics and actions. *See* R. 63, DSOF, Exh. D, Gaston Consultation (sealed). So, for instance, when Modi submitted the nephrology referral request on February 20, 2017, he received a same-day response from nephrologist Dwarka Rathi. Gaston Consultation at 6-7. Rathi noted that Gaston could be treated at the primary care level for the time being. DSOF ¶ 20.

---

[5]The parties use the term "Arista" throughout the briefing, but it appears that the correct name for the software is actually "AristaMD." "Arista" is the name of a company that provides networking solutions. It is a different company altogether from "AristaMD," which provides online medical consultations. For the sake of congruency with the briefing, the Court will use "Arista" in this Opinion. *See* https://www.arista.com/en/ (last visited March 18, 2020); https://www.aristamd.com (last visited March 18, 2020).

[6]Lake County Jail used Arista in place of the more traditional "utilization management" process. R. 61-3, DSOF, Exh. C, May Dep. Tr. at 51:1-24. Under that process, when a physician or physician's assistant decides that a patient requires a specialist referral, the referral request would be elevated first to the site medical director and then to the Armor corporate level. DSOF ¶¶ 32-33. The Armor corporate level would return a decision back to the individual site within 24 hours. *Id*. ¶ 33. In contrast, Arista allows physicians to directly submit requests for specialist consultations without going through the normal corporate approval process. *Id*. ¶ 37.

A few weeks later, on March 1, 2017, Modi secured a second electronic consultation for Gaston through Arista. DSOF ¶ 22. Specifically, Modi submitted a question about whether he needed to send Gaston to a nephrologist to manage his renal function. Gaston Consultation at 2. Modi again received a same-day response, this time from nephrologist Chadi Obeid. *Id.* at 3. Obeid recommended monitoring Gaston according to the following instructions:

> Check lab one after medication changes. If minimal proteinuria and stable creatinine and blood pressure less than 140/90, patient can be managed without nephrology referral and will need lab checks every three to four months.

DSOF ¶ 22. A few weeks later, on March 21, 2017, Modi reached out to Obeid to follow up on Gaston's condition. Gaston Consultation at 2. In response, Obeid recommended increasing the dosages of some medication and taking some laboratory tests, but he did not say anything about sending Gaston out for further specialist intervention. DSOF ¶ 26; Gaston Consultation at 4.

Finally, while all of this was happening, Gaston continued to submit medical sick-call requests and grievances about his kidney condition. The exact sequence of these events is not entirely clear from the record. But Gaston alleges that, at some point, he submitted a medical request to see Dr. May. Gaston Dep. Tr. at 57:9-18. He did not receive any response from Dr. May. *Id.* Also, at some point, he submitted two medical grievances, presumably related to his kidney treatment. Am. Compl. ¶¶ 46-49; Gaston Dep. Tr. at 48: 23-24, 49:1-3. Medical grievances were supposed to be reviewed by the Health Services Administrator at the Jail, who at the time of the relevant events was Allison Beatty. DSOF ¶¶ 51, 55. Yet the first time that Gaston

submitted a medical grievance, he did not get any response from Beatty. Gaston Dep. Tr. at 49:13-23. The second time, though, he did receive a written response saying that he would be given a specialist consultation. *Id.* at 50:2-20.

At some point after he submitted the grievances, Gaston was prescribed pain medication for his kidneys; also, an ultrasound of his kidneys was taken. DSOF ¶ 13; Gaston Dep. Tr. at 51:3-13. Although the timing is not clear, the record suggests he received the ultrasound in either mid- or late 2017. Gaston Dep. Tr. at 51:3-13.

At the end of 2017, Gaston was transferred out of Lake County Jail into the custody of the Illinois Department of CorrectionDSOF ¶¶ 1, 3. At the time of the summary judgment briefing, Gaston was serving an imprisonment sentence at Robinson Correctional Center. *Id.* ¶ 3. At Robinson, he did not receive any medication for his kidneys, though there was a period of time when he was given Tylenol for "kidney pains in [his] back." *Id.* ¶ 4. Gaston alleges that he continues to suffer from back pain. Am. Compl. ¶ 44.

## II. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550

U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

This case boils down to whether Gaston should have been given the opportunity to consult with a kidney specialist in person during his detention at Lake County Jail. Am. Compl. ¶ 59. At the summary judgment stage, the Court views the evidence in the light most favorable to Gaston and gives him the benefit of reasonable inferences. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As a threshold matter, both sides briefed Gaston's claims under the Eighth Amendment, which requires a plaintiff to show that prison officials acted with deliberate indifference toward a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). But Gaston was a pretrial detainee at the relevant time in this case, not

a prisoner serving a sentence after a criminal conviction.[7] This means that the correct standard of review for his inadequate medical treatment claims is not deliberate indifference, but rather the somewhat less stringent standard of objective reasonableness.[8] *See Miranda v. Cty. of Lake*, 900 F.3d 335, 351 (7th Cir. 2018); *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018); *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019). Under the objective reasonableness standard, Gaston must show that (1) the defendants acted purposefully, knowingly, or recklessly; and (2) the denial of in-person access to a kidney specialist was objectively unreasonable. *McCann*, 909 F.3d at 886. Having said that, just like under the Eighth Amendment's deliberate-indifference standard, mere negligence or even gross negligence is not enough to establish liability under the objective reasonableness standard. *Miranda*, 900 F.3d at 353. But beyond that, there is no need to prove that the defendants *subjectively* believed that they were providing inadequate care, only that their conduct was *objectively* unreasonable. *Id.* at 351. The state-of-mind requirement is

---

[7]To be clear, Gaston is described only as a "detainee" in the briefs, not a "pretrial detainee." But because Gaston was subsequently transferred into IDOC custody (where he is currently serving a sentence) shortly after the events of this case, the Court infers that he had not yet been convicted at the time of the events in this case. The Court will thus read "detainee" to mean "pretrial detainee."

[8]Claims brought by pretrial detainees arise under the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment's Cruel and Unusual Punishment Clause. *Miranda v. Cty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). As the Seventh Circuit explained in *Miranda*, pretrial detainees "stand in a different position" than prisoners because "they have not been convicted of anything," and "the punishment model is inappropriate for them." *Miranda*, 900 F.3d at 350 (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475(2015)). In *Kingsley*, the Supreme Court held that excessive-force claims by pretrial detainees should be assessed under an objective reasonableness standard, instead of the more stringent deliberate indifference standard, which governs Eighth Amendment claims. *Miranda*, 900 F.3d at 350. *Miranda* thus extended the reasoning of *Kingsley* to inadequate medical-care claims brought by pretrial detainees.

measured against each defendant's *actions* (that is, whether they intentionally or recklessly engaged in the action), rather than their subjective view of the risks of the allegedly inadequate medical care.

## A. Nurse Practitioner McDougall

With this legal framework in mind, first up is the claim against Nurse Practitioner McDougall. Here, the only event at issue is Gaston's November 1, 2016 sick call visit with McDougall. It is undisputed that during this visit, Gaston told McDougall that he was suffering from kidney pain, burning urination, and blood in his urine. DSOF ¶ 15. It is also undisputed that McDougall ultimately did not refer Gaston to a physician for further evaluation of his kidney issues, but instead diagnosed him with back pain and sent him off with some ibuprofen. *Id*. ¶ 17. The crux of Gaston's claim against McDougall is that she knew Gaston was suffering from kidney pain, yet she refused to treat him. R. 68, Pl.'s Resp. Br. at 6. According to Gaston, McDougall ignored his complaints and accused him of lying about his medical problems. Am. Compl. ¶ 55.

Starting with the allegation that McDougall called Gaston a liar, the record is murky on that point. First, it is not clear whether McDougall ever said the words "you are lying" to Gaston. McDougall, of course, denies saying those words to him. R. 61-5, DSOF, Exh. E, McDougall Dep. Tr. at 79: 13-15. But when Gaston was asked whether McDougall said she thought he was lying, Gaston testified, "She said those exact words." Gaston Dep. Tr. at 52:20-22. Even if McDougall did accuse Gaston of lying, it is not clear whether she accused him of lying about his pain *level* or whether

she accused him of lying about the *source* of his pain. Gaston initially alleged that McDougall "accused [him] of lying about his pain level." Am. Compl. ¶ 28. But later, when asked what words McDougall used when she accused him of lying, Gaston testified, "She said, it's not your kidneys, it's a back spasm." Gaston Dep. Tr. at 52:23-24, 53:1. This distinction between pain level and pain source is important, because there is not much of a reasonable basis for an outside observer like McDougall to challenge a purely subjective experience like the level of pain that a patient is feeling. In contrast, when it comes to the source of pain, there are plenty of objective markers beyond a patient's subjective experience that can shed light on the inquiry. Thus, Gaston would have a much stronger claim for inadequate medical care if McDougall had simply accused him of lying about his pain level and then dismissed his complaints altogether.

But that is not what happened in this case. For one, there does not seem to be any evidence that McDougall accused Gaston of lying about his pain *level*. Rather, Gaston's testimony suggests that she accused him of lying about the *source* of his pain. It is true that a healthcare provider generally should avoid, as a matter of professionalism, telling a patient that they must be "lying" about their symptoms. But even taking Gaston's version of events as true (as the Court must at this stage)—that is, that McDougall said the words "you are lying" to him—the facts still do not support a conclusion that McDougall's conduct was objectively unreasonable. Most importantly, McDougall did not dismiss Gaston's pain entirely. Rather, she conducted additional tests and relied on additional objective factors to conclude that he was

suffering from *back* pain, not kidney pain. For instance, it is undisputed that McDougall asked Gaston to locate his pain on his body, and he responded by pointing to an area on his back where the kidneys are not located. DSOF ¶ 16. After that, it is undisputed that McDougall conducted a percussive test on Gaston's kidney area; the test came back negative for pain. *Id.* She also conducted a urine dipstick test, which came back negative for blood and leukocytes.[9] *Id.*; Gaston Patient History at 129. It is true that Gaston told McDougall that he *believed* he had kidney pain instead of back pain, because he knew what a back spasm felt like. Gaston Dep. Tr. at 52: 10-14. But this statement taken alone would not have suggested to McDougall that Gaston had any special subjective knowledge of what kidney pain felt like, as opposed to back pain.[10] On these facts, then, it was not unreasonable for McDougall to rely on objective tests over Gaston's subjective belief, even if Gaston did not agree with her

---

[9]The Defendants do not explicitly explain the timing of when McDougall received the urinalysis results. Their statement of facts suggests that McDougall received the negative test results during the November 1, 2016 appointment itself, such that she could have relied on the test results in determining that Gaston did not have kidney pain. DSOF ¶ 16. Indeed, this version of events is supported by McDougall's notes in Gaston's medical charts. Gaston Patient History at 129. But in the Laboratory Tests section of those same charts, there are no urine tests dated November 1, 2016; instead the only urine tests from that time period are labeled with a "Date Received" of November 3, November 9, or November 10. *Id.* at 250-53. It is entirely possible that the "Date Received" values simply do not reflect the specific urine dipstick analysis that McDougall performed on November 1 (or that the dipstick test does not require a laboratory analysis at all). In any event, even if McDougall did not receive the urine test results before she diagnosed Gaston with back pain, the fact that she *ordered* a urinalysis is still enough to insulate her from liability in this case, because it shows that she did not ignore Gaston's claims of pain.

[10]It would be a different story, for instance, if Gaston's medical records showed a history of back spasms, McDougall reviewed those records, and Gaston said something like, "I have had back spasms in the past, and I know this is not a back spasm." Those facts would give more credence to Gaston's subjective belief that, on November 1, 2016, he was feeling kidney pain, so it would have been less reasonable for McDougall to discount his subjective belief in that case.

diagnosis. *See Williams*, 937 F.3d at 944 (disagreement with course of treatment "does not mean the course of treatment was objectively unreasonable"). All in all, even viewing the evidence in Gaston's favor, the factual record does not permit a reasonable jury to find that it was objectively unreasonable for McDougall to treat Gaston for back pain instead of kidney pain. McDougall reasonably (1) relied on Gaston's subjective report on where the pain emanated from, which was objectively not the location of his kidneys; (2) performed a percussive test; and (3) ordered a urine test. The claim against McDougall is dismissed.

## B. Dr. May

Gaston also asserts that Dr. May acted unreasonably by refusing to treat Gaston and by denying him access to a kidney specialist. Am. Compl. ¶ 56. It is not clear whether these are two separate claims against Dr. May, or whether there is only a single claim that Dr. May refused to treat Gaston *by* denying him access to a kidney specialist. Either way, Gaston has not offered enough evidence to allow a reasonable jury to conclude that Dr. May was objectively unreasonable in treating Gaston.

First, Gaston alleges that he "requested several times to be seen by the treating medical director, Dr. John May, but was refused." Am. Compl. ¶ 30. Gaston does not set forth the dates of these requests, except to allege that they were all submitted after his November 1, 2016 sick-call visit with McDougall. *Id.* Gaston also does not really describe the content of the medical requests, how many there were, or where

he submitted them.[11] At the time of the relevant events, Dr. May was the Chief Medical Officer for Armor and would occasionally visit the Jail, though he was not permanently staffed at the Jail. DSOF ¶¶ 27, 29. Gaston offers no evidence that Dr. May personally saw the requests—or was even alerted to them—or whether they were just processed and resolved by nurses through the standard sick-call request procedure. Finally, it is undisputed that Dr. May did not explicitly refuse Gaston's medical requests; rather, Gaston only concludes that Dr. May refused the requests because Gaston did not receive any responses to them. *Id.* ¶ 8. That fact standing alone is not enough evidence for a reasonable jury to find that Dr. May knew about the requests and ignored them.

Gaston also alleges that Dr. May's failure to secure an in-person nephrologist consultation for Gaston was unreasonable. Pl.'s Resp. Br. at 6. Again, it is undisputed that Dr. May did not explicitly refuse Gaston's request to see a specialist. DSOF ¶ 8. And to be clear, Gaston acknowledges that he received two *electronic* nephrologist consultations through the Arista platform. *Id.* ¶¶ 20, 22. What he takes issue with is the fact that he was never given the opportunity to consult with a kidney specialist *in person*. Pl.'s Resp. Br. at 5.

Even viewing the evidence in Gaston's favor, no reasonable jury could find that Dr. May acted unreasonably. It is undisputed that, on February 20, 2017, Dr. May had a conversation with Physician's Assistant Modi about a patient with elevated

---

[11]Gaston testified that copies of the medical requests exist—but they were mailed to his sister's house in Virginia. Gaston Dep. Tr. at 47:18-24, 48:1-22. It is unclear if the parties attempted to locate those copies, but they have not been included in the evidentiary record.

creatinine levels. DSOF ¶ 19. And it is undisputed that on that same day, Modi submitted a request for an electronic nephrologist consultation on behalf of Gaston, citing Dr. May's instruction. *Id.*; Gaston Consultation at 6-7. Modi received a same-day response from nephrologist Dwarka Rathi, who noted that Gaston could be treated at the primary care level pursuant to the specialist's instruction. Gaston Consultation at 6-7. Later, on March 1, 2017, Modi submitted a second electronic referral request and again received a same-day response, this time from nephrologist Chadi Obeid. *Id.* at 2-3. This time, the specialist recommended the following steps for monitoring Gaston:

> Check lab one after medication changes. If minimal proteinuria and stable creatinine and blood pressure less than 140/90, patient can be managed without nephrology referral and will need lab checks every three to four months.

*Id.* at 3. The problem, according to Gaston, was that these "conditions" were not met, so he should have been given access to a nephrologist in person. Pl. Resp. Br. at 2.

It is not entirely clear whether Gaston is challenging Modi's initial February 2017 decision to secure an electronic, rather than in-person, consultation, or if he is challenging the March 2017 failure to secure an in-person consultation *after* the "conditions" laid out during the second electronic consultation were supposedly not met, or if he is challenging both. In any event, these claims are premised on factual assumptions that are not supported by the record, so they must be dismissed.

On the initial February 2017 decision to secure an electronic consultation, rather than one in-person, the claim depends on an assumption that electronic consultations are inferior to in-person consultation (although Gaston does not

14

explicitly articulate this assumption). Otherwise, if the quality of electronic consultations were equivalent with the quality of in-person consultations, then there would be no harm in choosing an electronic consultation over an in-person consultation, and vice-versa; the quality of the assessment and recommendations of the nephrologist should be the same either way. So Gaston must be implying that the care he received from the electronic consultations caused him injuries that an in-person nephrologist consultation would have avoided. But Gaston does not offer evidence to support this assumption: there is no evidence about how electronic nephrology consultations are generally less reliable or helpful than in-person consultations, nor is there any evidence showing how Gaston personally fared worse because of the choice to pursue an electronic referral in lieu of an in-person referral. (For instance, it might be a different story if Dr. May had made a statement like, "electronic consultations are worse than in-person consultations, but I don't care because they're so much cheaper," but there is nothing like that in the record.) The only evidence in the record on this point comes from Dr. May's testimony that the Arista platform is actually *better* for patients because it can be difficult to obtain in-person specialist appointments on short notice in a correctional setting, whereas Arista offers specialist access 24 hours a day. May Dep. Tr. at 48:16-25. Indeed, both of Gaston's electronic referral requests received *same-day* responses from nephrologists. Gaston Consultation at 2, 7.

And as for Gaston's allegation that he should have been given an in-person consultation after the "conditions" of the electronic consultation were not met, he puts

forth two disputed facts. The first disputed fact is that the conditions—minimal proteinuria, stable creatinine levels, and blood pressure less than 140/90—needed to be met to avoid a nephrology referral. PSOF ¶ 78. The second disputed fact is that Gaston required a follow up from a nephrologist. *Id.* ¶ 79. But nestled in between those facts is the unwritten assumption that the "conditions" were *not* met. And for that assumption, Gaston does not provide any evidence. For instance, he does not cite to any testimony or anything in his medical records showing that any of those three conditions were not met. For the sake of completeness, the Court notes that there are a few instances in his medical records where his blood pressure appears to have risen above 140/90 in the period following the electronic nephrologist consultations. Gaston Patient History at 153-62. But even then, it is still not clear what "blood pressure less than 140/90" means—does it mean Gaston must be referred to a nephrologist if there is a *single* instance of his blood pressure rising above 140/90, or does it mean his blood-pressure readings need to be consistently above 140/90 for some period of time? There is nothing in the record, other than the text of the recommendation itself, to shed light on what actually needed to happen in order for the conditions to be considered not met. Indeed, it appears that Modi actually reached out to Dr. Obeid (the nephrologist from the March 1, 2017 electronic consultation) a few weeks after the second electronic consultation, sending him a follow-up message that Gaston's blood pressure readings were 150/102 and 144/110 over a two-day period. Gaston Consultation at 4. In response, Obeid instructed Modi to increase the dosages of

certain medications and conduct a laboratory test. *Id.* Obeid did not say anything about sending Gaston to meet with an in-person nephrologist. *Id.*

In sum, Gaston has not offered any evidence that anything less than an in-person consultation was unreasonable. Gaston received two electronic consultations, and no reasonable jury could find that Dr. May's response to Gaston's medical condition was objectively unreasonable. The claim against Dr. May is dismissed.

### C. Health Services Administrator Beatty

Gaston brings a similar claim against Beatty, alleging that she also denied his requests to see a kidney specialist. Am. Compl. ¶ 56. At the time of the relevant events, Beatty was the Health Services Administrator at the Jail. DSOF ¶ 51. Part of her role involved responding to inmate medical grievances. *Id.* ¶ 55. Specifically, if a detainee submitted a grievance about the medical treatment he was receiving, Beatty would review the detainee's medical chart and talk to the provider about the plan of care for the detainee. *Id.* But Beatty did not make clinical decisions about whether to refer a patient to a specialist. *Id.* ¶ 52.

Gaston submitted two medical grievances while at the Jail. Am. Compl. ¶¶ 46-49; Gaston Dep. Tr. at 48:23-24, 49:1-3. According to Gaston, he never received a response to his first grievance, but he did receive a written response to his second grievance, which said that he would get a specialist consultation. Gaston Dep. Tr. at 49:13-24, 50:1-18. Despite this response, Gaston notes, all he received was a kidney ultrasound; he did not see a specialist. *Id.* at 50:2-20.

It is undisputed that at some point, Beatty had a conversation with Gaston in the dayroom. DSOF ¶ 9. During that meeting, Beatty "went over his medical charts, told him about his kidneys, and even informed [him] that he was now on a renal diet." Pl.'s Resp. Br. at 4; DSOF ¶ 9. According to Gaston, Beatty thus knew about his kidney condition, so she was deliberately indifferent (or acted objectively unreasonable) to his medical needs when she denied him access to a specialist through the grievance process. Pl.'s Resp. Br. at 4.

At the summary judgment stage, all evidence must be viewed in Gaston's favor. But the problem is that there are simply too many gaps in the alleged evidence against Beatty to allow a reasonable jury to conclude, based on the available facts, that Beatty's response was objectively unreasonable. For one, Gaston does not summarize or describe the content of his two grievances, nor did the parties attach copies of the grievances to either the complaint or the briefs, so there is no way to know specifically what Gaston wrote or requested. Judging from the nature of Gaston's claim against Beatty, the Court can infer that the grievances did request to see a kidney specialist. But even then, it is not clear whether Gaston specified that he wanted to see a specialist for an *in-person* consultation or just that he had kidney issues and needed a specialist. The content of his requests matters because it is undisputed that he did receive two electronic nephrologist consultations through the Arista platform in February and March 2017. Even if the electronic consultations were not what Gaston had in mind, the fact that he received them at all (not to

mention the fact that he received an ultrasound) undermines his claim that Beatty ignored his requests. *See Williams*, 937 F.3d at 944.

What's more, this inquiry is complicated by the unclear timing of the grievances. Even though Gaston alleged in his Amended Complaint that he submitted grievances in January 2017 and February 2017, Am. Compl. ¶¶ 46, 48, he later testified that he did not remember when the grievances were submitted, Gaston Dep. Tr. at 49: 10-12. If the second grievance was filed *before* the Arista consultations, then Beatty could very well have elevated Gaston's concerns to Physician's Assistant Modi, who then requested the nephrologist consultation for Gaston. This version of events would fit in with Gaston's testimony that he *did* receive a written response to his second grievance—he was allegedly told that he would be provided a specialist consultation for his kidneys (although he maintains that this was a non-response because he was only given an ultrasound, not an in-person specialist). *See id.* at 50:2-20.

And even if the grievances were submitted sometime *after* Gaston's Arista consultations, there is still no evidence that Beatty ignored or denied the grievances. Gaston's only testimony in support of Beatty's misconduct is that he did not get a response to his grievances. Gaston Dep. Tr. at 72:1-4. But it is impossible to tell from that fact standing alone whether Beatty did or did not elevate his grievances. The fact that Gaston received no response could certainly mean that Beatty chose not to elevate his grievance at all, but given that Beatty was *not* the final decisionmaker on whether to refer a patient to a specialist, it could equally mean that Beatty elevated

his grievance, and the *physician* decided not to refer him to a specialist (or decided to pursue a different course of treatment in lieu of a specialist referral). Without any evidence of even the approximate timing of the grievances relative to the other events in this case, a reasonable jury cannot conclude that Beatty denied Gaston's requests to see a kidney specialist.

Gaston also does not allege any facts about when his meeting with Beatty in the dayroom took place. It is undisputed that this was the only in-person interaction between Beatty and Gaston. DSOF ¶ 9. But because there is no hint of when this meeting took place, it is not clear whether Beatty spoke to Gaston before he submitted both grievances, after he submitted the first grievance but before the second, or after he submitted both grievances. So it is unclear whether this meeting was even related to the grievances or was in fact intended to address or respond to one or both grievances.

Gaston is essentially asking a jury to infer from these facts that (1) Beatty was on duty both times he submitted his two grievances; (2) Beatty actually received and reviewed both grievances; (3) the grievances contained enough information to alert Beatty that Gaston was in need of a kidney specialist; (4) it was Beatty's fault that Gaston did not receive an in-person specialist consultation; and (5) even if Gaston had an in-person specialist consultation, the treatment plan would have been any different than what the electronic consultations recommended. But even viewing the evidence in Gaston's favor, the factual record does not permit a reasonable jury to

pile inference upon inference to find that Beatty was objectively unreasonable in reviewing Gaston's grievances. The claim against Beatty is dismissed.

### D. Armor

Finally, Gaston brings a *Monell* claim against Armor, the private corporation that provides medical services at the Jail. Private corporations acting under the color of law are liable under § 1983 for constitutional injuries caused by a "policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Ill. Dep't. of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). To state a *Monell* claim, a plaintiff must prove: (1) the deprivation of an underlying substantive constitutional right; (2) the existence of an official policy or other custom; and (3) that this policy or custom was the moving force behind the deprivation of his substantive constitutional rights. *See Teesdale v. City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012). Here, Gaston argues that Armor "maintained a policy of utilizing Arista, an electronic consultant software, that allowed Armor to circumvent having referral physicians actually examine the detainees in person." Pl.'s Resp. Br. at 7.

Gaston has not provided any evidence, however, that Armor actually has a policy of using Arista to "circumvent having referral physicians actually examine the detainees in person," aside from the record of his *own* treatment in this case. And even then, Gaston has not necessarily provided any evidence that Armor used Arista for the *purpose* of circumventing in-person consultations or was deliberately indifferent (which has a different meaning for *Monell* claims) that electronic

consultations would result in constitutional-rights violations. Without more, Physician's Assistant Modi's choice to secure two electronic consultations through Arista—limited to evidence about Gaston himself—does not amount to a policy, custom, or practice under *Monell*. *See Shields*, 746 F.3d at 796 ("[I]solated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy."). In other words, just because Gaston himself did not ultimately receive an in-person consultation in this case does not mean other patients had the same experience. For instance, it could very well be the case that other patients who require specialist referrals are given in-person consultations right away or are given in-person consultations after receiving one or more electronic consultations. And on that latter point, there is no evidence that starting off with an electronic consultation automatically closes the door in-person consultations later on.[12]

Even if Gaston can show that Armor had a policy of using Arista to "circumvent" in-person consultations, Gaston has not offered any evidence that the policy caused (that is, was the "moving force" behind) his alleged injuries. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Like the claim against Dr. May, the *Monell* claim here is premised on the assumption—which is not explicitly articulated in the briefing—that electronic consultations are inferior to in-person consultations, such that the choice to use an electronic consultation caused injuries that would not

---

[12]Gaston argues that it is essentially impossible for anyone at the Jail to ever receive a specialist referral because (1) nurses conduct initial health assessments, but (2) nurses do not have the authority to secure specialist referrals for patients. Pl.'s Resp. Br. at 7-8. But this is really not such a dispositive argument against Armor, considering the undisputed fact that nurses may escalate patient concerns to physicians, who do have the authority to request specialist referrals if needed. *See* DSOF ¶¶ 43-44.

have been caused by an in-person consultation. But Gaston has not offered any evidence in support of that key assumption. Without that, the *Monell* claim against Armor must be dismissed.

## IV. Conclusion

The motion for summary judgment is granted in its entirety. The status hearing of April 3, 2020 is vacated. The Court will enter final judgment.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 18, 2020